1

2

3

4

5

6

7

8

9

10

# UNITED STATES DISTRICT COURT

11

### EASTERN DISTRICT OF CALIFORNIA

12

13

KAINOA LAWRENCE ALLIANIC ROBB, by and through his guardian ad litem, BRIDGETTE AGUILAR,

Case No.  1:12-cv-02091-SKO

14

**ORDER AFFIRMING ALJ'S DECISION**

Plaintiff,

15

16

v.

17

CAROLYN W. COLVIN,
Acting Commissioner of Social Security,

18

Defendant.

19

_____/

20

21

## I.   INTRODUCTION

22

Plaintiff Kainoa Lawrence Allianic Robb ("Plaintiff"), by and through his guardian ad

23

litem Bridgette Aguilar, seeks judicial review of a final decision of the Commissioner of Social

24

Security (the "Commissioner" or "Defendant") denying his application for supplemental security

25

income ("SSI") pursuant to Title XVI of the Social Security Act (the "Act").  42 U.S.C. § 1383(c).

26

The matter is currently before the Court on the parties' briefs, which were submitted, without oral

27

argument, to the Honorable Sheila K. Oberto, United States Magistrate Judge.[1]

28

_____

[1] The parties consented to the jurisdiction of a U.S. Magistrate Judge.  (Docs. 12, 13.)

## II.   FACTUAL BACKGROUND

Plaintiff was born in 1987 and alleges disability beginning on December 1, 2005, due to mental impairments.  (AR 177.)  Plaintiff filed a protective application for SSI on March 30, 2009.  (AR 16.)

**A.      Relevant Medical Evidence[2]**

Between 2006 and 2008, Plaintiff was under the care of the University of California, Davis Medical Center on an outpatient basis in its psychiatry clinic.  (AR 279.)  Plaintiff was diagnosed with schizophrenia, paranoid type, and was in continuous treatment with psychotherapy and medications during this time period.  (AR 279.)  It was noted by treating physician Michael Mirzenberg, M.D., that Plaintiff was "adherent to his treatment, as well as the majority of his follow[-]up appointments, and [was] very stable clinically for the majority of this time."  (AR 279.)

On May 29, 2008, the Transcultural Wellness Center ("TWC") completed a psychiatric evaluation and intake form.  (AR 282.)  The intake form was completed by Hendry Ton, M.D., and indicates Plaintiff's history was significant for exacerbations characterized by increased irritability, lack of sleep, and psychotic symptoms.  (AR 282.)  The intake form provides as follows:

> I have given him the presumptive diagnosis of bipolar disorder, most recent manic with psychotic features, although schizoaffective disorder is a possibility given poor functioning in between exacerbation.  Substance induced mood/psychotic disorder is also likely, given that his recent exacerbations have been triggered by drug use.  Client has some insight into impact of substance use on mental health and interpersonal relationships.  Family dynamics are also complex in his system of support.  [Grandmother] helps to enforce strong limits and consequences, but in the long run will need to invest in the client some ownership over his treatment.  At the conclusion of interview, family revealed that client was continuing to see his psychiatrist at EDAPT, Dr. Mitzenberg.  And he was still prescribing medications.  I informed them that it would not be clinically appropriate for me to prescribe medications as he still had a treating psychiatrist.  Family agreed to decide to continue with Dr. Mitzenberg or to get med support services with me and to let us know of their decision.

---

[2] Although all the medical evidence has been considered, only the evidence relevant to Plaintiff's arguments has been summarized in this order.

(AR 282.)   Dr. Ton assigned a Global Assessment of Functioning ("GAF") score of 53.[3] (AR 181.)

On July 3, 2008, Plaintiff was examined by Tammi R. James, M.D.  (AR 305.)  Plaintiff reported increased suicidal thoughts and more irritability.  (AR 305.)  Plaintiff also reported he believed marijuana helped control his irritability and suicidal thoughts.  The diagnosis remained bipolar disorder, and Risperdal and Cogentin were prescribed.  (AR 305.)

Plaintiff was again seen at TWC on August 21, 2008, and reported decreased sleep and energy, a sad mood, and fleeting suicidal ideation without a plan.  (AR 304.)  Plaintiff also reported continued marijuana use, but reported a plan to quit.  (AR 304.)

Plaintiff was treated on November 6, 2008, at TWC.  (AR 297.)  Plaintiff had not been seen there since August 2008 and, since that time, had been evicted and lived in a room in Sacramento.  Plaintiff reported mood lability with periods of irritability and angry outbursts as well as periods of easy tearfulness.  He described getting into physical fights and being quick to anger for little things.  He reported decreased need for sleep, and admitted he had not taken his Risperdal for several weeks during the summer and only recently started taking it again.  He had stopped taking it due to muscle pain and feeling too dull.  He had been smoking marijuana daily with increased use, spending $200 every two to five days.  He stated he was trying to quit, but felt he could not stop using because marijuana helped to improve his moods, sleep, and appetite.  (AR 297.)  He reported drinking a bottle of Barcardi the night before the examination and had blacked out.  (AR 297.)  Plaintiff indicated a desire for inpatient treatment.

Also on November 6, 2008, Dr. James completed a "verification of physical/mental incapacity" form for general assistance through the County of Sacramento.  (AR 300.)  The form indicated Plaintiff did not have a permanent disability, but he could not perform gardening/maintenance work or secretarial/clerical work.  (AR 300.)  Dr. James estimated

---

[3] The GAF scale is a tool for "reporting the clinician's judgment of the individual's overall level of functioning."  Am. Psychiatric Ass'n, Diagnosis & Statistical Manual of Mental Disorders 32 (4th ed. 2000).  The clinician uses a scale of zero to 100 to consider "psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness," not including impairments in functioning due to physical or environmental limitations.  *Id.* at 34.  A GAF score between 51 and 60 indicates moderate symptoms or moderate difficulty in social, occupational, or school functioning.  *Id.*

1   Plaintiff's work incapacity would end or require re-evaluation by June 30, 2009. (AR 300.) She

2   also noted Plaintiff was not cooperating with prescribed medical treatment, and his treatment

3   participation had been inconsistent. (AR 300.)

4       On December 4, 2008, Plaintiff was again seen at TWC. (AR 292.) Plaintiff reported he

5   had only taken his prescription for Seroquel for four days and then stopped due to sedation side

6   effects.   He reported he slept for 24 hours and housing staff could not wake him; according to

7   Plaintiff, they suggested he stop taking the medication. (AR 292.) He could not remember what

8   he had done with the portion of the prescription he had not taken; Plaintiff admitted knowing

9   Seroquel sells on the street for $10 per tablet, but he denied selling his tablets.   He reported

10  irritable and sad moods, poor sleep, and increased drug use. (AR 292.) He had not been using

11  marijuana daily, but he had started using crystal meth and ecstasy. (AR 292.) His mother, who

12  was present for the examination, expressed concern that Plaintiff would die if he continued his use

13  of street drugs and continued to fail to take his medications. (AR 292.) Dr. James restarted

14  Plaintiff on Seroquel to treat his mood, and he was encouraged to take the medication consistently

15  as prescribed; his medication was not to be refilled early. (AR 292.) Plaintiff was reportedly

16  ambivalent about treatment for his drug use. (AR 292.)

17      On December 29, 2008, Plaintiff was again treated at TWC. (AR 294.) Plaintiff reported

18  continued drug use.   Mental status examination notes indicate Plaintiff had a somber mood,

19  blunted affect, and themes of feeling abandoned by family and the need for belongingness and

20  finding it in his drug-using peers. (AR 294.)

21      Plaintiff was next seen at TWC on February 5, 2009. (AR 288.) He had been off his

22  medication since January 15, 2009. Plaintiff reported being a well-respected drug dealer, holding

23  special parties all the time; he also admitted using drugs daily. (AR 288.) He was ambivalent

24  about seeking treatment on the one hand, but Dr. James indicated that in the next moment, he

25  tearfully stated he wanted to quit using. (AR 288.) It was noted that Plaintiff presented with poor

26  hygiene, frequent facial tics, fair eye contact, dysthymic mood, labile affect, tangential thought

27  process, and increased drug use. (AR 288.) He was diagnosed with bipolar I, manic severe with

28  psychotic features, alcohol abuse, marijuana abuse, rule out dependence; and likely

methamphetamine dependence.  (AR 288.)  Plaintiff's mother reported a highly consistent history of manic episodes with psychosis in high school prior to substance abuse.  (AR 288.)

On February 12, 2009, a chart note indicates "Devin and Kham," apparently employees of TWC, went to visit Plaintiff that week at his home after he reported he was unable to get transportation to his appointment at TWC.  (AR 287.)  They discussed concerns about Plaintiff's missed appointments for therapy and his medication management; they developed an attendance contract for Plaintiff's treatment.  (AR 287.)  They also planned to pursue inpatient treatment again and created a plan for Plaintiff to follow through with outpatient drug-addiction treatment.  Devin reported that Plaintiff presented as paranoid and delusional at times, making statements like, "the police are listening to me from the roof, my phone is being tapped, and everyone on 14th avenue would be shot if I came to TWC and made a phone call."  (AR 287.)

A TWC treatment note dated February 26, 2009, states Plaintiff's case was discussed and a taxi was sent to pick Plaintiff up for his appointment.  Plaintiff was reportedly living in clean and sober housing, and he had not been abusing substances.  (AR 286.)  Plaintiff had been struggling with mood, sleep, and psychosis and requested to be placed back on his medications, which Dr. James noted she supported with close monitoring.  (AR 286.)

A TWC treatment note dated March 5, 2009, states Plaintiff was seen by a visiting medical student, Gary Tsai, MSIV.  Plaintiff reported he no longer wanted to be in treatment, and he felt the clinic had nothing to offer him.  He stated he enjoyed using drugs, and reported being kicked out of his clean and sober living for selling marijuana.  (AR 286.)  He reportedly purchased marijuana with his general assistance money, and no longer had any money for food.  His housing had been paid by TWC, and Plaintiff stated he was not worried about being "kicked out" of his housing because he could have drug parties.  Plaintiff told staff he had been buying Seroquel on the streets and wanted to restart it.  Plaintiff questioned his bipolar diagnosis and noted he had been using drugs since he was 11 years old.  (AR 284.)  On examination, Plaintiff exhibited frequent facial and body tics and sniffling; his eye contact was fair; his speech was spontaneous and fluent.  He stated a desire to continue using drugs, and was ambivalent about continuing his treatment at TWC.

1    On June 3, 2009, Plaintiff's medical records were reviewed and evaluated by A. Garcia,
2  M.D.  (AR 310-22.)  Dr. Garcia noted there was insufficient evidence to evaluate due to Plaintiff's
3  failure to cooperate.  (AR 322.)

4    Treatment records from Kaweah Delta Health Clinic ("Kaweah") dated July 25, 2009,
5  indicate Plaintiff was seen by Nirmal S. Brar, M.D., who diagnosed SCPT (schizophrenia, chronic
6  paranoid type), ADHD (attention deficient hyperactivity disorder), bipolar, depression, and
7  cannabis abuse.  (AR 332.)  Treatment notes indicate Plaintiff was slow in elementary school and
8  placed in special education in the third grade.  (AR 333.)  He graduated from high school, but did
9  not pass the state test.  (AR 333.)  Plaintiff's insight was poor and his judgment was considered
10 fair.  He was assigned a GAF score of 50.  (AR 334.)  Plaintiff reported that cannabis worked best
11 for him, and he had no desire to stop his use.  Dr. Brar told him he needed to make a choice
12 between the cannabis and his medication.  (AR 334.)

13    Plaintiff was again seen by Dr. Brar on August 8, 2009.  (AR 332.)  Plaintiff reported he
14 was without medication for the prior two weeks, and he demonstrated mood instability.  (AR 332.)
15 Mental status examination revealed a guarded mood, as well as poor to fair insight and judgment.
16 (AR 332.)  He was to follow-up with Dr. Brar in two weeks.  (AR 332.)

17    Plaintiff was again examined by Dr. Brar on August 28, 2009.  (AR 335.)  Plaintiff
18 reported he had not started his medication yet.  (AR 335.)  His appetite was good, but his sleep
19 was poor.  Plaintiff's thoughts were described as goal oriented and there were no auditory or visual
20 hallucinations, paranoia, or other signs of psychosis at that time.  (AR 335.)  Dr. Brar assessed
21 bipolar and cannabis dependence.  (AR 335.)  A further treatment plan was to be discussed at
22 Plaintiff's next visit.

23    On November 12, 2009, state agency non-examining physician Kim P. Morris, PsyD,
24 reviewed Plaintiff's medical records.  (AR 336-54.)  Dr. Morris noted Plaintiff's allegations were
25 only partially credible because of his inconsistent reporting, poor treatment compliance, and
26 continued substance abuse.  (AR 346.)  Dr. Morris opined Plaintiff retained the ability to complete
27 simple tasks in a nonpublic environment if he was not using/abusing substances.  (AR 346.)

28

Plaintiff was also treated at Clinica Sierra Vista Behavioral Health Center ("Sierra Vista"). (AR 355.)  Treatment notes dated January 22, 2010, indicate Plaintiff's medication compliance was good, he had no side-effects, he was less agitated and paranoid, and his sleep had improved. (AR 355.)

On February 24, 2010, Plaintiff was again seen at Sierra Vista, and it was noted that his medication compliance was "good."  (AR 356.)  He was experiencing dizziness as a side effect and reported being more "sedated" on Risperdal.  (AR 356.)  Plaintiff exhibited paranoid ideation, his insight was poor, but his judgment was fair.  (AR 356.)  His attention and concentration were described as impaired, but his orientation was intact.  (AR 356.)  On June 11, 2010, a progress note indicates that Plaintiff was taking Seroquel, but the rest of the psychiatric progress note was not completed.  (AR 358.)

A progress note from Sierra Vista dated February 10, 2011, indicates Plaintiff had stopped taking his medication, he was confused, disorganized, and exhibited no ability to concentrate. (AR 360.)  His thought process was disorganized, he exhibited paranoid ideation, and he reported auditory and visual hallucinations.  (AR 360.)  His insight and judgment were both considered "poor."  (AR 360.)  Plaintiff reported restarting marijuana use, and had used a few days before the examination; he also reported alcohol and tobacco use.  (AR 360.)

On March 10, 2011, Plaintiff was again seen at Sierra Vista.  (AR 364.)  Plaintiff was noted to be taking Seroquel, but continued to have mood swings and was irritable.  (AR 364.)  His thought process and content was noted to be "unremarkable," his insight was poor, but his judgment was noted to be fair, and his memory and concentration were marked as intact. (AR 364.)   His prognosis was considered "guarded," and his disability level was marked as "severe."  (AR 365.)  Dr. Khan noted Plaintiff's marijuana dependence was in remission.  Plaintiff refused to attend substance abuse counseling.  (AR 365.)

On March 28, 2011, Dr. Khan completed a "mental assessment" form, which indicated Plaintiff was markedly limited in his ability to remember locations and work-like procedures; understand and remember very short and simple instructions; understand, remember, or carry out detailed instructions;  maintain attention and concentration for extended periods; perform activities

within a schedule, maintain regular attendance, be punctual within customary tolerances; work in coordination with or in a proximity to others without being distracted by them; maintain socially appropriate behavior and adhere to basic standards of neatness and cleanliness; respond appropriately to changes in the work setting; be aware of normal hazards and take appropriate precautions; travel in unfamiliar places or use public transportation; or set realistic goals or make plans independently.  (AR 369-71.)  Plaintiff was noted to be moderately limited in his ability to sustain an ordinary routine without special supervision; and to carry out very short and simple instructions.  (AR 370-71.)

**C.    Administrative Proceedings**

The Commissioner denied Plaintiff's application initially and again on reconsideration; consequently, Plaintiff requested a hearing before an Administrative Law Judge ("ALJ").  (AR 71, 75-79, 80-82.)  On March 23, 2011, the ALJ held a hearing.  (AR 33-67.)  Plaintiff testified, through the assistance of counsel, and a vocational expert provided testimony.  (AR 33-67.)

**1.    Plaintiff's Hearing Testimony**

Plaintiff testified it had been months since he had used marijuana, but he had not kept track of exactly when he last used.  (AR 53.)  He stated that he had never sold drugs, and that it had been years since he had used cocaine, ecstasy, or methamphetamines.  (AR 55.)  He also reported it had been months since he had consumed alcohol.  (AR 55.)  He indicated he used to sell marijuana and alcohol (AR 56)[4] and had stolen money from his grandmother to purchase drugs (AR 59).  The only medication he takes now is Seroquel, which causes side effects such as moodiness and irritability.  (AR 60.)  He has punched holes in the walls when arguing with his grandmother, and he has thrown things; he almost hurt her because they "got into a push and shove argument."  (AR 61.)  He does not feel that he is getting any better, and if he was not living with his grandmother, he would be on the streets.  (AR 61.)  He wants to be a massage therapist, but believes that is not possible because his medication prevents him from functioning and staying awake in school.   (AR 62.)   His treatment with psychologists or psychiatrists helped him. (AR 62.)  He has been to job interviews before, but they would not give him a job because of his

---

[4] Plaintiff's hearing testimony was inconsistent in this regard.

bipolar disorder and low social skills, and because he cannot get along with others, is manic, and violent.  (AR 63.)  He worked a seasonal job in high school.

### 2.     Testimony of Plaintiff's Grandmother

Jeanette Allianic, Plaintiff's grandmother, testified that Plaintiff grandson lives with her currently and has lived with her on and off for the last 10 to 15 years; she is aware that he has a substance abuse problem.  (AR 36, 38.)  She reported he has not been using currently, but she did not know the last time he used.  (AR 37.)  She enrolled him in a Proposition 38 program where he had to go through training to make sure that he was not on drugs.  (AR 37.)

Plaintiff's family life is very unstable.  In her opinion, Plaintiff has a mental problem which she first became aware of when he was in the second or third grade because he was not able to keep up with his class.  (AR 39.)  She took steps at that time to arrange for special education, and to ensure he was enrolled in a medical program of some sort.  (AR 39.)  Plaintiff has received mental health treatment and sometimes she has had to take him to a medical doctor for treatment of side effects from his medication.  (AR 39.)  He has been diagnosed with bipolar and schizophrenic paranoia.  (AR 39.)  He did poorly in school; he had social skill problems and he was unable to do the classroom work.  (AR 40.)  Plaintiff was never expelled from school, but he had to be absent due to his mental illness when he was confined in a Sacramento mental health facility.  (AR 40.)  Plaintiff has been on a lot of different medications, but primarily Risperdal, Seroquel, and Abilify.  (AR 41.)  The medications never really helped him because the side effects affected his whole ability to function.  (AR 41.)  The physicians changed medication frequently because of the side effects.  (AR 41.)

Plaintiff has attempted suicide three or four times.  (AR 41.)  One time he jumped off a bridge when he was depressed and the reports indicated he was under the influence of alcohol.  (AR 42.)  Plaintiff had been drug tested before the hearing, and the results show that he was "clean."  (AR 42.)  When clean, he still exhibits problems such as passive aggressive behavior, he is very disobedient, sluggish, and does not want to follow rules or orders in her home.  (AR 42.)  He becomes agitated; once when she asked him to wash the dishes, it caused a shoving match.  (AR 42.)  She reported he has physically assaulted her on several occasions.  (AR 42.)

She does not feel Plaintiff is able to work eight hours a day, five days per week.  (AR 43.)
He cannot concentrate or focus on tasks that are very simple.  Even the smallest tasks around the
house take him too much time and he becomes agitated in the process.  Many times she has had to
finish the jobs that he starts because otherwise the task will never be done.  (AR 43.)   Plaintiff has
told her drugs give him a lot of comfort, as opposed to his medications which cause side effects.
(AR 43.)  She would kick him out if he started taking drugs.

Plaintiff has been committed several times, most recently in Sacramento County.  (AR 46.)
Even without drug use, he would not be able to work because he can hardly function.  When he is
on the medication, all he does is sleep.  He is unable to maintain his own personal hygiene, and
she has to remind him of things all the time.   Plaintiff becomes agitated with her, which is
worsening.

### 3.     Vocational Expert's Hearing Testimony

A vocational expert ("VE") testified at the hearing.  (AR 64-65.)  The ALJ asked the VE to
consider a hypothetical person of the same age, education, and work history as Plaintiff who has
no exertional limitations, but who is limited to simple, repetitive tasks with no public interaction.
(AR 64.)  The VE testified that such an individual would be able to perform work as a harvest
worker, a cleaner, or a laundry worker.  (AR 64.)

The ALJ next asked the VE to consider an individual with the same limitations as the first
hypothetical, except this hypothetical person would be unable to relate appropriately to
supervisors, co-workers, or concentrate in two-hour increments or follow job instructions.
(AR 65.)  The VE testified that an individual limited in that manner would not be able to perform
any work.  (AR 65.)

### 4.     The ALJ's Decision

On April 15, 2011, the ALJ issued a decision finding Plaintiff not disabled.  (AR 16-28.)
Without consideration of Plaintiff's substance abuse, the ALJ determined Plaintiff has the Residual
Functional Capacity ("RFC")[5] to perform a full range of work at all exertional levels but is limited

---

[5] RFC is an assessment of an individual's ability to do sustained work-related physical and mental activities in a work
setting on a regular and continuing basis of 8 hours a day, for 5 days a week, or an equivalent work schedule.  Social
Security Ruling 96-8p.  The RFC assessment considers only functional limitations and restrictions that result from an

1    to simple repetitive tasks with no public interaction; the ALJ found Plaintiff is unable to relate

2    appropriately to supervisors and co-workers, concentrate in 2-hour increments, or follow

3    instructions.  (AR 20.)  If Plaintiff stopped his substance abuse, the ALJ found he would retain the

4    RFC to perform a full range of work at all exertional levels, but he would be limited to simple,

5    repetitive tasks with no public interaction.  (AR 23.)

6         The ALJ found Plaintiff (1) has not engaged in substantial gainful activity since the date

7    the application was filed; (2) has the following severe impairments or combination of

8    impairments:  bipolar disorder, schizophrenia, a mood disorder, a history of poly substance

9    dependency, a history of alcohol dependency, and a history of cannabis dependency; (3) does not

10   have an impairment or combination of impairments that meets or medically equals one of the

11   impairments set forth in 20 C.F.R. Part 404, Subpart P, Appendix 1, Part A or B; and (4) has no

12   past relevant work.  However, if Plaintiff stopped his substance abuse, he can perform work that

13   exists in significant numbers in the national economy.  (AR 27.)

14        Plaintiff sought review of the ALJ's decision before the Appeals Council.  (AR 10.)  On

15   September 19, 2012, the Appeals Council denied review.  (AR 6-9.)  Therefore, the ALJ's decision

16   became the final decision of the Commissioner.  20 C.F.R. § 416.1481.

17   **D.       Plaintiff's Contention on Appeal**

18        On December 12, 2012, Plaintiff filed a complaint before this Court seeking review of the

19   ALJ's decision.  Plaintiff contends the ALJ erred by failing to state clear and convincing reasons

20   for finding Plaintiff not fully credible.

21                              **III.   SCOPE OF REVIEW**

22        The ALJ's decision denying benefits "will be disturbed only if that decision is not

23   supported by substantial evidence or it is based upon legal error." *Tidwell v. Apfel*, 161 F.3d 599,

24   601 (9th Cir. 1999).  In reviewing the Commissioner's decision, the Court may not substitute its

25   judgment for that of the Commissioner.  *Macri v. Chater*, 93 F.3d 540, 543 (9th Cir. 1996).

26

27   individual's medically determinable impairment or combination of impairments.  *Id.*  "In determining a claimant's

28   RFC, an ALJ must consider all relevant evidence in the record including, inter alia, medical records, lay evidence, and
     'the effects of symptoms, including pain, that are reasonably attributed to a medically determinable impairment.'"
     *Robbins v. Soc. Sec. Admin.*, 466 F.3d 880, 883 (9th Cir. 2006).

1   Instead, the Court must determine whether the Commissioner applied the proper legal standards

2   and whether substantial evidence exists in the record to support the Commissioner's findings.  *See*

3   *Lewis v. Astrue*, 498 F.3d 909, 911 (9th Cir. 2007).

4        "Substantial evidence is more than a mere scintilla but less than a preponderance."  *Ryan v.*

5   *Comm'r of Soc. Sec.*, 528 F.3d 1194, 1198 (9th Cir. 2008).   "Substantial evidence" means "such

6   relevant evidence as a reasonable mind might accept as adequate to support a conclusion."

7   *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consol. Edison Co. of N.Y. v. NLRB*,

8   305 U.S. 197, 229 (1938)).  The Court "must consider the entire record as a whole, weighing both

9   the evidence that supports and the evidence that detracts from the Commissioner's conclusion, and

10  may not affirm simply by isolating a specific quantum of supporting evidence."  *Lingenfelter v.*

11  *Astrue*, 504 F.3d 1028, 1035 (9th Cir. 2007) (citation and internal quotation marks omitted).

12                              **IV.   APPLICABLE LAW**

13        An individual is considered disabled for purposes of disability benefits if he is unable to

14  engage in any substantial, gainful activity by reason of any medically determinable physical or

15  mental impairment that can be expected to result in death or that has lasted, or can be expected to

16  last, for a continuous period of not less than twelve months.  42 U.S.C. §§ 423(d)(1)(A),

17  1382c(a)(3)(A); *see also Barnhart v. Thomas*, 540 U.S. 20, 23 (2003).  The impairment or

18  impairments must result from anatomical, physiological, or psychological abnormalities that are

19  demonstrable by medically accepted clinical and laboratory diagnostic techniques and must be of

20  such severity that the claimant is not only unable to do his previous work, but cannot, considering

21  his age, education, and work experience, engage in any other kind of substantial, gainful work that

22  exists in the national economy.  42 U.S.C. §§ 423(d)(2)-(3), 1382c(a)(3)(B), (D).

23        The regulations provide that the ALJ must undertake a specific five-step sequential

24  analysis in the process of evaluating a disability.   In the First Step, the ALJ must determine

25  whether the claimant is currently engaged in substantial gainful activity.   20 C.F.R.

26  §§ 404.1520(b), 416.920(b).  If not, in the Second Step, the ALJ must determine whether the

27  claimant has a severe impairment or a combination of impairments significantly limiting her from

28  performing basic work activities.   20 C.F.R. §§ 404.1520(c), 416.920(c).  If so, in the Third Step,

the ALJ must determine whether the claimant has a severe impairment or combination of impairments that meets or equals the requirements of the Listing of Impairments ("Listing"), 20 C.F.R. 404, Subpart P, App. 1.  20 C.F.R. §§ 404.1520(d), 416.920(d).  If not, in the Fourth Step, the ALJ must determine whether the claimant has sufficient residual functional capacity despite the impairment or various limitations to perform her past work.  20 C.F.R. §§ 404.1520(f), 416.920(f).  If not, in the Fifth Step, the burden shifts to the Commissioner to show that the claimant can perform other work that exists in significant numbers in the national economy. 20 C.F.R. §§ 404.1520(g), 416.920(g).  If a claimant is found to be disabled or not disabled at any step in the sequence, there is no need to consider subsequent steps.  *Tackett v. Apfel*, 180 F.3d 1094, 1098-99 (9th Cir. 1999); 20 C.F.R. §§ 404.1520, 416.920.

## V.    DISCUSSION

### A.    Sequential Evaluation in the Context of Substance Addiction

Pursuant to the Contract with America Advance Act of 1996 ("CAAA"), the Social Security Act was amended to provide that "an individual shall not be considered to be disabled . . . if alcoholism or drug addiction would . . . be a contributing factor material to the Commissioner's determination that the individual is disabled."  42 U.S.C. § 423(d)(2)(C).

Under the regulations promulgated by the Commissioner, the ALJ must follow a specific analysis where substance addiction is an issue.  First, the ALJ must conduct the first five-step inquiry, as set forth above, without attempting to determine the impact of substance abuse/addiction.  If the ALJ finds the claimant is not disabled under the five-step evaluation, the claimant is not entitled to benefits, and there is no need to proceed further with the analysis. 20 C.F.R. § 416.935(a).  If, on the other hand, the ALJ finds the claimant disabled, and there is evidence of substance addiction/abuse, the ALJ must proceed under the sequential evaluation pursuant to § 416.935 to determine if the claimant would still be disabled absent the substance addiction/abuse.  *Bustamante v. Massanari*, 262 F.3d 949, 955 (9th Cir. 2001).  If found disabled with the effects of substance addiction/abuse, it is the claimant's burden to show the substance addiction is not a contributing factor to his disability.  *Parra v. Astrue*, 481 F.3d 742, 748 (9th Cir. 2007).  A drug-addicted claimant "who presents inconclusive evidence of materiality has no

13

1   incentive to stop [abusing drugs], because abstinence may resolve his disabling limitations and

2   cause his claim to be rejected or his benefits terminated."  *Id.*

3   **B.      The ALJ's Consideration of Plaintiff's Credibility**

4          Plaintiff asserts the ALJ failed to state clear and convincing reasons for discrediting his

5   testimony regarding his mental functioning absent drug and alcohol use.   The Commissioner

6   contends that, regardless of whether the ALJ found Plaintiff credible, Plaintiff was ineligible for

7   benefits because alcoholism or drug addiction was a contributing factor material to the

8   determination that Plaintiff was disabled.  (Doc. 22, 6:8-13.)

9          **1.      Legal Standard**

10         In   evaluating   the   credibility   of   a   claimant's   testimony   regarding   subjective

11  symptomatology, an ALJ must engage in a two-step analysis.  *Vasquez v. Astrue*, 572 F.3d 586,

12  591 (9th Cir. 2009).  The ALJ must first determine whether the claimant has presented objective

13  medical evidence of an underlying impairment that could reasonably be expected to produce the

14  pain or other symptoms alleged.  *Id.*  The claimant is not required to show that his impairment

15  "could reasonably be expected to cause the severity of the symptom [he] has alleged; [he] need

16  only show that it could reasonably have caused some degree of the symptom."  *Id.* (quoting

17  *Lingenfelter*, 504 F.3d at 1036).  If the claimant meets the first test and there is no evidence of

18  malingering, the ALJ can only reject the claimant's testimony about the severity of the symptoms

19  if he gives "specific, clear and convincing reasons" for the rejection.  *Id.*  As the Ninth Circuit has

20  explained:

21         The ALJ may consider many factors in weighing a claimant's credibility, including
           (1) ordinary techniques of credibility evaluation, such as the claimant's reputation
22         for lying, prior inconsistent statements concerning the symptoms, and other
           testimony by the claimant that appears less than candid; (2) unexplained or
23         inadequately explained failure to seek treatment or to follow a prescribed course of
           treatment; and (3) the claimant's daily activities.  If the ALJ's finding is supported
24         by substantial evidence, the court may not engage in second-guessing.

25

26  *Tommasetti v. Astrue*, 533 F.3d 1035, 1039 (9th Cir. 2008) (citations and internal quotation marks

27  omitted); *see also Bray v. Comm'r of Soc. Sec. Admin.*, 554 F.3d 1219, 1226-27 (9th Cir. 2009);

28  20 C.F.R. §§ 404.1529, 416.929.  Other factors the ALJ may consider include a claimant's work

record and testimony from physicians and third parties concerning the nature, severity, and effect of the symptoms of which he complains.  *Light v. Soc. Sec. Admin.*, 119 F.3d 789, 792 (9th Cir. 1997).

**2.    Analysis**

In first conducting the sequential analysis without respect to Plaintiff's substance abuse disorders, the ALJ found that Plaintiff had the RFC to perform a full range of work at all exertional levels, but had the following nonexertional limitations:  he retained the ability to perform simple, repetitive work with no interaction with the public; he is unable to relate appropriately to supervisors and coworkers; he is unable to concentrate in 2-hour increments, and is unable to follow directions.  (AR 20.)  As to Plaintiff's credibility in the first sequential evaluation, the ALJ concluded that Plaintiff was "credible concerning the symptoms and limitations with the above findings of his residual functional capacity assessment during the time of his substance use." (AR 21.)

In conducting the second sequential evaluation, the "drug abuse and alcoholism analysis" ("DAA"), and considering Plaintiff's abilities and limitations if he **stopped** his substance abuse, the ALJ found Plaintiff would have the RFC to perform work at all exertional levels, but with the following nonexertional limitations:  he would retain the ability to perform simple, repetitive tasks with no interaction with the public.  (AR 23.)  As it pertains to Plaintiff's credibility if he stopped his substance abuse, the ALJ found as follows:

> The claimant reported in April 2009 that he had no desire to socialize with people, even with his family members, including his grandmother, whom he described as his greatest support.  He reported being tired even after having a full night's sleep, and noted he had a difficult time getting out of bed.  The claimant reported that headaches prevent him from doing simple chores, such as brushing his teeth.  He reported he needed reminders to brush his teeth, to take a bath or shower.  He also reported he was unable to concentrate and comprehend simple instructions, like emptying the garbage, fix his bed, getting the mail from the mailbox and carrying groceries from the car into the house.  He also noted he never wanted to assist with any of the simple yard work or housework that he was expected to do.  He described himself as board and confined to the house watching television.  He also noted he did not prepare meals as he lacked an appetite.  (Exhibit 7E, p. 2.)

The claimant testified that Seroquel made him very moody and irritable. He also stated he cannot get along with other people and can get very violent with other people. The claimant testified that he has had job interview[s] but he was not given jobs because he is bi-polar, lacks social skills and he can be violent.

. . .

[Plaintiff's] medically determinable impairments could reasonably be expected to produce the alleged symptoms; however, the claimant's statements concerning the intensity, persistence, and limiting effects of these symptoms are not credible to the extent they are inconsistent with the residual functional capacity for the reasons explained below.

The claimant alleged disability due to mental impairments, as previously stated in this decision and which will not be repeated here. The medical evidence, when substance abuse is not considered, fails to provide strong support for the claimant's allegations of disabling symptoms and limitations. More specifically, the medical findings do not support the existence of limitations greater than the above listed residual functional capacity. Despite the complaints of allegedly disabling symptoms, there have been significant periods since the alleged onset date during which the claimant has not taken any medications for those symptoms and his doctors report poor medication compliance (Exhibit 3F). Although the claimant has alleged various side effects from the use of medications, the record indicates generally that those side effects would not interfere with the claimant's ability to perform work activities in any significant manner.

The claimant testified candidly to his substance use, admitted his prior daily use of marijuana until six months before the hearing. He also testified that he had not used alcohol, cocaine and various poly substance in the past two years. The claimant had reported to Dr. James that he felt marijuana controlled his irritability and suicidal thoughts and was ambivalen[t] on quitting (Exhibit 3F, p. 26). Dr. James reported the claimant was well controlled on medications in the past, but with increasing intermittent psychosis and mood changes present with poor medication compliance and escalating drug and alcohol use his current mood and psychotic symptoms are most likely related to chronic drug use. [Sh]e also noted the claimant was not interested in treatment (Exhibit 3F, p. 5). Dr. Brar told him that he needed to make a choice between medications and cannabis, and the claimant told the doctor he felt cannabis worked best for him and he had no desire to stop. He also stated he liked the effect of Seroquel when mixed with cannabis (Exhibit 7F, pp. 4-5). The claimant reported to Dr. Khan in January 2011 he felt less agitated, but improved sleep and was less paranoid with medication compliance reported as "good[,]" with no side effects noted, sleep was marked "OK" and there are no mood or thought issues reported (Exhibit 11F, p. 1). This is in sharp contrast with the claimant's condition one month later, February 2011 when compliance is noted as "poor" and he presented as confused, disorganized and had no concentration. His sleep was reported as marginal. His mood was sad and irritable with auditory hallucinations and paranoid ideation. At this time, it is reported his substance use was alcohol, marijuana and tobacco and he was advised to abstain from drugs and was referred to substance abuse counseling (Exhibit 11F, p. 6).

1

2

3

4

> As illustrated above, the claimant['] symptoms have been demonstrably affected by his continued substance use.  By the weight of the record, when substance use is removed the claimant would have the residual functional capacity as detailed above.

5

6

> Additionally, the claimant does not have a strong work history.  The claimant has posted earnings since his alleged onset date of 2005.  He has minimal no earnings in the years before 2005, and none in the years after 2005 (Exhibit 4D).

7   (AR 26.)

8   In sum, the ALJ found Plaintiff less than fully credible because Plaintiff was willfully not

9   compliant with prescribed treatment, and because the medical evidence demonstrates that

10  Plaintiff's limitations were exacerbated and more extensive when he is on drugs and alcohol; but

11  he is not as impaired or limited when he is sober and compliant with medication.

12  As an initial matter, the Commissioner's argument that the credibility determination is

13  irrelevant in light of the ALJ's conclusion that substance abuse was a factor material to the

14  disability finding in the first sequential analysis is unpersuasive.  Consideration of Plaintiff's

15  credibility as part of the DAA analysis is an integral part of the ALJ's materiality determination.

16  Thus, if Plaintiff's credibility was not properly assessed in the course of the DAA analysis, the

17  ultimate materiality conclusion is flawed.  However, as discussed below, Plaintiff's assertions of

18  error with regard to the ALJ's credibility finding are also unpersuasive.  The ALJ adequately set

19  forth a legally sufficient basis to reject Plaintiff's credibility.

20       **a.**     **Lack of Compliance with Medication and Treatment**

21  Plaintiff asserts the ALJ erred in finding him not fully credible regarding the extent of his

22  limitations because he is not always compliant in taking his medication.  Plaintiff argues his

23  failure to be medication-compliant is an effect of his mental disorder, and therefore his lack of

24  medication compliance is not a clear and convincing basis to discredit his testimony about the

25  degree of his limitations absent use of drugs and alcohol.  (Doc. 19, 22:10-23:6.)

26  Failure to be compliant with a prescribed medication regime generally raises an issue of

27  credibility in that, if the disability or limitations are as severe as stated, a claimant typically is

28  sufficiently motivated to follow a prescribed course of treatment in search of resolution or

improvement of the limitations and/or pain.   When a claimant fails to follow a prescribed course of treatment for the complained of limitations, it leads to a question whether the claimant is really as limited or affected by pain as stated.   Thus, lack of medication/treatment compliance is generally a credibility consideration.   *See* 20 C.F.R. § 416.930(b) ("If you do not follow the prescribed treatment without a good reason, we will not find you disabled"); *Fair v. Bowen*, 885 F.2d 597, 603 (9th Cir. 1989) ("an unexplained, or inadequately explained failure . . . to follow a prescribed course of treatment . . . can cast doubt on the sincerity of the claimant's pain testimony"); *see also* Social Security Ruling ("SSR") 96-7p, 1996 WL 374186 at *7 (July 2, 1996) ("the individual's statements may be less credible if . . . the medical reports and records show that the individual is not following the treatment as prescribed and there are no good reasons for this failure").

A good reason, however, can provide a valid excuse for not following prescribed treatment, including for example, that a family physician does not recommend the treatment, the treatment is dangerous or painful, or there is a lack of insurance or funds to pursue the recommended course of treatment.   When a good reason is offered by the claimant, the failure to follow prescribed treatment may not constitute a clear and convincing basis to discredit a claimant's symptom/pain testimony.   *See Orn v. Astrue*, 495 F.3d 625, 636 (9th Cir. 2007).

In cases where a claimant suffers mental illness but fails to remain medication complaint, there may be a question whether the individual actually appreciates or understands the value of the treatment or has the cognitive or emotional ability to follow a treatment plan.   *See Garcia v. Astrue*, 2011 WL 884126, at *18 (W.D. Wash. Feb. 15, 2011) ("When mental illness is involved, assuming that a failure to comply with prescribed treatment suggests a *willful* failure to comply with prescribed treatment can be illogical.  This is in part because a person suffering from a mental illness may not realize that he needs his medication, or he may not realize even that his 'condition reflects a potentially serious mental illness.'" (quoting *Van Ngyuen v. Chater*, 100 F.3d 1462, 1465 (9th Cir. 1996))).   In such cases, the failure of an individual to be medication or treatment compliant may speak more to the extent of underlying disability than to whether the claimant is being entirely candid about the scope or extent of his or her limitations.   In other words, the

mental illness itself may constitute a "good reason" why the claimant cannot follow through with prescribed treatment.

Here, the record demonstrates Plaintiff's extensive failure to remain medication compliant between 2008 and 2011.  His physicians often noted he was not medication compliant and was electing instead to use alcohol and/or drugs.  (AR 287-88, 291-92, 295, 297, 300, 360.)  The ALJ noted Plaintiff had frequently mentioned to his physicians he was ambivalent about quitting his drug use because he felt it better controlled his symptoms.  (AR 284, 305, 334.)  Plaintiff asserts in his brief that part of his problem with medication compliance is the fact that he has significant side effects from the medication, including that it makes him feel dull, sedated, and even induces suicidal thoughts.  (AR 292, 297, 333, 356.)  However, often when Plaintiff reported side effects such as muscle pain and feeling too dull, he was also admittedly using/abusing substances.  (AR 297.)  For example, in December 2008, Plaintiff told Dr. James he stopped taking Seroquel after only four days because it made him feel sedated.  (AR 292.)  He told Dr. James that he lost the remainder of his medication, but acknowledged that Seroquel sells on the street for $10 per pill; he denied selling the remainder of his medication.  (AR 292.)  His mother reported that he was spaced out, irritable, and twitching the week prior to the examination.  (AR 292.)  Yet, at the examination, it was also noted Plaintiff reported taking "crystal meth" four times in three weeks.  (AR 292.)

Also, on July 2009, Plaintiff stated that he stopped taking his prescription for Celexa because he felt it was making him agitated and caused suicidal thoughts.  (AR 333.)  At this time, however, he was still noted to be cannabis dependent.  (AR 334.)  His doctor told him he needed to choose between the medication and the cannabis.  (AR 334.)  And, although Plaintiff reported in February 2010 that Risperdal made him feel more sedated, there is no indication that he quit taking his Risperdal for this reason.  (AR 356.)

Under the circumstances presented here, the treating records are susceptible to a rational interpretation that Plaintiff willfully chooses substance use/abuse in lieu of his medication, rather than an inability to appreciate the need to follow the recommended treatment or because of side

effects from the medication.[6]   There was also concern expressed by his physicians that he was selling his medication on the streets.   (AR 288 ("He has been taking Seroquel with limited improvement, but of concern is his poor compliance and street value from $2-$10/pill"), 292 ("he has not been taking [S]eroquel due to complaints of sedation.  Of concern is its street value of about $10/pill").)  It was rational for the ALJ to implicitly conclude Plaintiff had no good excuse for his failure to maintain the medication and treatment regime urged by his physicians.  (*See* AR 27 ("The credibility of the claimant's allegations is weakened by consistent and continued substance abuse . . . ").)

Plaintiff also contends the ALJ failed to take into account that Plaintiff's mental condition can precipitate substance abuse, but Plaintiff points to no treating record where a physician noted this to be a facet of his mental conditions in particular.[7]   Further, in May 2009, Dr. Ton indicated that Plaintiff had "some insight into impact of substance use on mental health and interpersonal relationships."  (AR 282.)  The record supports an inference that Plaintiff consciously chooses to disregard his physicians' treatment recommendations without an adequate basis for doing so. Therefore, despite that Plaintiff has underlying mental conditions, medication compliance was an appropriate credibility consideration.

### b.    Lack of Medical Evidence To Support Extent of Limitations

A lack of medical evidence to corroborate the extent of claimed disabling limitations is a factor the ALJ may consider along with others in assessing Plaintiff's credibility.  *See Tidwel v. Apfel*, 161 F.3d 559, 602 (9th Cir, 1998) (an ALJ may properly rely on weak objective support in assessing credibility of statements regarding subjective symptomatology).  Here, the ALJ found "[t]he medical evidence, when substance abuse is not considered, fails to provide strong support for the claimant's allegations of disabling symptoms and limitations."  (AR 25.)

---

[6] Further, it is not at all clear that repeatedly electing to stop taking prescribed medication because of the existence of well-known, non life-threatening side effects actually constitutes a good reason to forego the medication.  This is particularly true because the record reflects Plaintiff had regular appointments and follow-up appointments with his physicians who could have timely, competently, and safely adjusted his prescribed dosages and types.

[7] Notably, Dr. Khan, one of Plaintiff's treating physicians, indicated in a check-box opinion that Plaintiff could control his drinking and use of drugs.  (AR 372.)

1    The ALJ noted Dr. Mitzenberg's August 2008 report stating Plaintiff had been in

2 continuous treatment with psychotherapy and medications for approximately two years at the

3 University of California.  Dr. Mitzenberg indicated Plaintiff had been adherent to treatment, as

4 well as with the majority of follow up appointments, and had been very stable clinically for the

5 majority of his treatment.  (AR 25, 279.)

6    The ALJ contrasted this report with Dr. James' March 2009 treatment note indicating that,

7 while Plaintiff had been well controlled with medication in the past, with escalating drug and

8 alcohol use, his mood and psychotic symptoms are most likely related to chronic drug use.

9 (AR 25, 284.)  At that time, Dr. James elected to "hold off on prescribing Seroquel . . . He has not

10 been taking [it] consistently, has not been attending appointments regularly, has been of limited

11 effectiveness due to AOD issues, and with potential for selling on the street.  He states he has not

12 had it in 3 months and does not want or need it."  Dr. James also stated that "[c]lient is not

13 interested in treatment."  (AR 284.)

14    The ALJ also discussed treatment notes from Dr. Brar.  In July 2009, Plaintiff reported to

15 Dr. Brar that he liked the effect of mixing Seroquel and cannabis.  (AR 333.)  He also told Dr.

16 Brar that he thought cannabis worked best for him, and he had no desire to stop his use.  (AR 334.)

17 Dr. Brar informed Plaintiff that he had to make a choice between medication and cannabis.

18 (AR 334.)  When Plaintiff was medication compliant in January 2010 and there was no substance

19 abuse noted, he reported no side effects, his sleep was marked as "OK," and there was no mood or

20 thought issues reported.  (AR 355.)  However, when Plaintiff was noted to be off medication in

21 February 2011, he was noted to be using alcohol, marijuana, and tobacco, and he presented as

22 confused, disorganized, and had no concentration.  His sleep was reportedly marginal, his mood

23 was sad, and he was irritable with auditory hallucinations and paranoid ideation.

24    These records are substantial evidence to support an inference that Plaintiff's limitations

25 are not as severe as he described when he is medication compliant and abstains from drug and

26 alcohol use.  While Plaintiff continued to experience some limitations when he was medication

27 compliant and not abusing drugs or alcohol, there is a sufficient basis in the record for the ALJ to

28

1 conclude Plaintiff was more symptomatic when he was abusing drugs or alcohol and was not
2 medication compliant.

3    Plaintiff contends there are many medical records showing instances of good medication
4 compliance, no alcohol or drug use, but still noting symptoms and findings comparable to those
5 without medication-compliance and substance abuse.  (Doc. 19, 24:6-9.)  Plaintiff cites a treatment
6 record dated February 2009 noting Plaintiff had not been using substances and he was still
7 struggling with mood, sleep, and psychosis.  (AR 286.)  Nevertheless, this record also notes that
8 Plaintiff was not taking medication as he was requesting to "be back on his medications," which
9 Dr. James supported with close monitoring.  (AR 286.)   A treatment note from January 2010
10 indicates medication compliance was good, and no substance abuse was noted.  (AR 355.)
11 Plaintiff's grooming was neat, his speech normal, his thought process unremarkable, his insight
12 and judgment considered "fair," and he was not reporting any side effects.  (AR 355.)  A February
13 2010 treatment note likewise indicated good medication compliance with no substance abuse
14 noted, but Plaintiff was experiencing dizziness as a side effect, he felt more sedated on Risperdal,
15 his insight was considered poor, but his judgment fair; his concentration was impaired, and he was
16 experiencing some paranoid ideation.  (AR 356.)

17    In February 2011, Plaintiff was noted to have poor medication compliance and he had been
18 consuming alcohol and tobacco.  (AR 360.)  He appeared sad, his speech was rapid, his thought
19 illogical, his insight and judgment were poor, and he had both paranoid ideation and visual and
20 auditory hallucinations.  (AR 360.)  When he resumed medication in March 2011, Plaintiff was
21 still experiencing auditory hallucinations, but his thought content was unremarkable and no
22 paranoid ideation or visual hallucinations were noted; his insight was poor, but his judgment had
23 improved to fair; no side effects were marked, and he was noted to be less sedated on Seroquel.
24 (AR 364.)  Plaintiff refused substance abuse counseling as had been recommended.  (AR 365.)

25    Ultimately, it was noted on multiple occasions that Plaintiff's drug use and lack of
26 medication compliance increased his symptoms of psychosis.  (*See, e.g.,* AR 284 ("He was well
27 controlled on medication in the past, but with increasing and intermitted psychosis and mood
28 changes present with poor medication compliance and escalating drug and alcohol use . . . His

1  current mood and psychotic symptoms are most likely related to chronic drug use.").)  Thus, while

2  the records may be susceptible to another more favorable interpretation to Plaintiff, the Court must

3  uphold the ALJ's interpretation if it is rational and based on substantial evidence.   *Burch v.*

4  *Barnhart,* 400 F.3d 676, 679 (9th Cir. 2005) (explaining that ALJ's interpretation of the evidence

5  will be upheld so long as it is rational, even if "the evidence is susceptible to more than one

6  rational interpretation").  The fact that Plaintiff notes some findings that could support another

7  rational interpretation is not a basis to overturn the ALJ's credibility determination.  *Id.*  The

8  treating records above provide support for the ALJ's interpretation.  The lack of medical evidence

9  to corroborate Plaintiff's allegations of disabling limitations when he was medication compliant

10  and substance-use free was a factor the ALJ was entitled to consider in concert with Plaintiff's

11  refusal to maintain medication compliance.

12       Plaintiff also argues the ALJ mischaracterized the evidence when referring to treatment

13  records "in sharp contrast" between January 2011 and February 2011.  (Doc. 19, 25:1-12.)  The

14  January 2011 note to which the ALJ refers was actually a January 2010 chart note, thus the

15  treatment records were not one month apart, as the ALJ indicated.  (See AR 26.)  Nonetheless, the

16  ALJ's analysis of these treatment notes is not predicated on their temporal proximity; rather, the

17  ALJ cited these notes as an example of the divergence between Plaintiff's symptoms when he had

18  good medication compliance and no substance abuse, i.e., January 2010, and when he was not

19  compliant with medication and was using substances, i.e., February 2011.  Thus, the mistaken

20  reference to a "January 2011" treatment note does not undercut the ALJ's analysis.

21       In sum, the lack of treating notes to support his allegations of disabling symptoms when

22  medication-compliant and not using/abusing substances was a legally sufficient credibility

23  consideration.

24          **c.**     **Plaintiff's Work History**

25       The ALJ's final reason for finding Plaintiff less credible was his lack of work history.

26  Plaintiff was only 24 years old at the time of decision and alleged disability since he was 18.  This

27  is markedly different from a case where an individual who has been of working age for many

28  years has no work history even prior to the alleged disability onset date.  For example, in *Thomas*

*v. Barnhart,* the claimant's "work history was spotty, at best, with years of unemployment between jobs, even before she claimed disability in June of 1993." 278 F.3d at 959.  Under those facts, the ALJ's consideration of the claimant's work history was deemed by the appellate court to be a sufficient credibility consideration.  Here, in view of Plaintiff's young age and his alleged onset date, a lack of a work history is not a clear and convincing basis to discount his credibility. Nonetheless, because the ALJ provided other legally sufficient reasons to discount Plaintiff's credibility, this error is harmless.  *See Batson v. Comm'r Soc. Sec. Admin.*, 359 F.3d 1190, 1197 (9th Cir. 2004) (where ALJ provides a number of justifications for his decision, only one of which constitutes error, court must determine whether remaining legitimate justifications provide substantial evidence supporting the decision).

## VI.   CONCLUSION

After consideration of the Plaintiff's and Defendant's briefs and a thorough review of the record, the Court finds that the ALJ's decision is supported by substantial evidence and is, therefore, AFFIRMED.  The Clerk of this Court is DIRECTED to enter judgment in favor of Defendant Carolyn W. Colvin, Acting Commissioner of Social Security, and against Plaintiff.

IT IS SO ORDERED.

Dated:   **February 27, 2014**                       **/s/ Sheila K. Oberto**
                                             UNITED STATES MAGISTRATE JUDGE